UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
GRACE MASON and JAHTHAIME SMITH

Plaintiffs,

- against-

**OPINION AND ORDER**
**15-CV-5841 (SJF)(GRB)**

ANTIOCH UNIVERSITY and
WEST COAST ADJUSTORS,

Defendants.
----------------------------------------------------------X
FEUERSTEIN, J.

On October 9, 2015, plaintiffs Grace Mason ("Mason") and Jahthaime Smith ("Smith") (collectively, "plaintiffs") filed, *inter alia*: (1) a *pro se* complaint against defendants Antioch University ("the University") and West Coast Adjustors ("WCA") (collectively, "defendants") pursuant to, *inter alia*, 42 U.S.C. § 1983 ("Section 1983") and Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. §§ 2000d, *et seq.*, alleging violations of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and discrimination on the basis of race, color, national origin and religion; and (2) an unsigned application to proceed *in forma pauperis*.[1] Since plaintiffs' financial status, as set forth in their declarations in support of their respective applications, qualifies them to commence this action without prepayment of the filing

[1] By letter dated October 15, 2015, plaintiffs were advised by the Court's Pro Se Office that their application to proceed *in forma pauperis* was deficient because "[e]ach plaintiff must complete a separate IFP application . . . ." (Docket Entry ["DE"] 8). On October 29, 2015, plaintiffs filed separate, signed applications for leave to proceed *in forma pauperis* in accordance with the Notice of Deficiency. (DE 9 and 10).

fee, *see* 28 U.S.C. § 1915(a)(1), their applications to proceed *in forma pauperis* are granted.[2] Plaintiffs now move pursuant to Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction "granting the reinstatement of . . . Smith to [the] University," and the University moves to dismiss plaintiffs' claims against it in their entirety pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure for lack of personal jurisdiction. For the reasons set forth below, the University's motion is granted and plaintiffs' motion is denied.

## I. Background

### A. Factual Background

Mason and Smith are black Americans and immigrants from Jamaica, West Indies. (Complaint ["Compl."], ¶¶ 3-4). In addition, Smith is a member of the Rastafarian faith. (*Id.*, ¶ 3). Mason is Smith's mother; resides in Nassau County; is a retired court reporter; and receives social security disability benefits. (*Id.*, ¶¶ 5, 6 and 9).

Smith has been a student in the "Doctor of Psychology in Clinical Psychology program" at the University's Seattle, Washington campus since October 2011. (Compl., ¶ 7; *see also* Mason's Affidavit in Opposition to the University's Motion to Dismiss ["Mason Aff."], ¶ 5). According to Smith, he "first became interested in [the University] after a professor had recommended the school to [him][,]" (Smith's Affidavit in Opposition to the University's Motion to Dismiss ["Smith Aff."], ¶ 4), and "[a]fter browsing [the University's] website on the internet, [he] grew further interest[ed] in [it]." (*Id.*, ¶ 5). At that time, he lived in New York

[2] However, since plaintiffs filed returns of service indicating that defendants have already been served with process in this action, (*see* DE 15), service by the United States Marshal Service is not required in this case. *Cf.* Fed. R. Civ. P. 4(c)(3).

with his mother. (*Id.*, ¶ 6).

"After doing a bit of research through [the University's] website, [Smith] decided to apply to [its] Seattle, Washington campus." (Smith Aff., ¶ 8). After Smith submitted his application, he was contacted by a recruitment representative for the University. (*Id.*, ¶ 9). When Smith "expressed concern that [he] could not visit the campus or appear for an in person interview because [he] reside[s] in New York," (*id.*, ¶ 10), the recruitment representative, *inter alia*, scheduled "a Skype interview, a consumer grade online audio or video conferencing system, which would occur in New York." (*Id.*, ¶ 12). Thereafter, while in his home in New York, the University "conducted [Smith's] recruitment interview through a video conference, via Skype." (*Id.*, ¶ 13). According to Smith, "[t]he remainder of the recruitment process, which all occurred via electronic means, was done from [his] residence in New York." (*Id.*, ¶ 14). Smith "subsequently was accepted to [the University] and began [his] studies." (*Id.*, ¶ 15).

Smith has completed three (3) of the five (5)-year course requirements, which cannot be extended beyond the year 2018. (Compl., ¶ 7). According to plaintiffs, the University's "population carries a student population of white to minority ratio of ten to two[] . . . [and] [i]ts faculty ratio of white to minority is ten to four." (*Id.*, ¶ 33).

Plaintiffs allege, *inter alia*, (1) that after Smith reported to the University that he was being harassed by a white student based upon his national origin, "no remedy was forthcoming . . .," (Compl., ¶ 10(a)); (2) that Smith was "constantly" "ridiculed" and "overlooked" by his professor and classmates during class discussions "on counselling [sic] of different races" because "his expressed political beliefs conflicted with the majority of the white students on the authenticity of studies relating to counselling [sic] of different races, wherein all races were

discussed, except Blacks[,]" (*id.*, ¶ 10(b)); (3) that Smith "was the only student called upon to elaborate or give insights of inner city poverty . . . and crime . . . despite the fact that [he] had no knowledge of such lifestyles, having lived in Massapequa . . . New York[,]" (*id.*, ¶ 10(c)); (4) that a professor told Smith (a) "that at first glance, she did 'not like [him]' and only changed her perspective after she got 'to know [him] better[,]'" (*id.*, ¶ 10(d)), and (b) that "he was too confident[,]" (*id.*, ¶ 10(e)); (5) that Smith "was regularly confronted with demeaning racial jokes, taunting, racial slurs, and derogatory racial nicknames and innuendos[,]" (*id.*, ¶ 11), and "was constantly subjected to demeaning and derogatory remarks because of his religion[,]" (*id.*, ¶ 15); (6) that Smith "was criticized and harassed with racial innuendos" for forming the Antioch University Black Student Association, (*id.*, ¶ 13); (7) that Smith "was alienated by students and professors in class . . . [,]" (*id.*, ¶ 14); and (8) that Smith's "perspective on religion was insulted and ridiculed in class discussions[,]" (*id.*, ¶ 16). According to plaintiffs, Smith "reported such continuous harassment to [the] University and tried to schedule a meeting with the school to no avail." (*Id.*, ¶ 12).

Plaintiffs allege that when Smith took a paternity leave of absence in or about 2014, (Mason Aff., ¶ 7), the University "penalized [him] for attending to his family's responsibilities" and issued him "a notice of withdrawal" from the University. (Compl., ¶ 17). However, plaintiffs also allege that the University's "withdrawal of [] Smith was based on financial default and nothing else[,]" (*id.*, ¶ 30); and that while Smith was out on paternity leave, the University withdrew him from his studies "solely" on the grounds that he "owed outstanding tuition." (Smith Aff., ¶ 17; Mason Aff., ¶ 8). According to plaintiffs, although the University claimed to withdraw Smith "based on outstanding tuition, . . . in fact [it] was using the outstanding tuition as

a ruse for its discrimination, breach of contract, and deception." (Compl., ¶ 18).

Plaintiffs allege that when they contacted the University about Smith's outstanding tuition, they were told that he would not be readmitted until the outstanding tuition was paid in full. (Compl., ¶ 19; Smith Aff., ¶ 18; Mason Aff., ¶ ¶ 9-10). According to Smith, although he and Mason advised the University that Mason "was on social security disability and could not afford to pay the outstanding tuition outright, [the University] advised [them] that paying the full balance was the only way [Smith] would be able to resume [his] studies there." (Smith Aff., ¶ 19).

In their complaint, plaintiffs allege that after Mason had contacted the University, she "made an initial partial payment [of the outstanding tuition] to [the] University after commencing a negotiation to pay the outstanding balance." (Compl., ¶ 20; *see also* Mason Aff., ¶ 12 ["Although I have no obligation to pay [the tuition debt], I began negotiations with [the University] in response to their representation that they would re-admit [Smith] into school upon full payment."]). According to Mason, "all negotiations were done via electronic means." (Mason Aff., ¶ 13). Mason "subsequently spoke to [the] University to arrange a payment plan for [the] outstanding tuition and to advise [the University] that she was on Social Security Disability and could not afford the full payment[,] and . . . that [] Smith only worked parttime [sic] and . . . is supporting his newborn and would not have the full amount due at the time." (Compl., ¶ 21; *see also* Mason Aff., ¶ 14). Although plaintiffs allege in their complaint that the University then referred Mason to WCA, "the collection agency acting on behalf of [the] University," (Compl., ¶ 22); in her affidavit in opposition to the University's motion to dismiss, Mason asserts that in response to her claim that she "could not afford to pay the outstanding tuition outright," (Mason

Aff., ¶ 14), the University advised her "that paying the full balance was the only way that [Smith] would be able to resume his studies there." (*Id.*, ¶ 15).

Plaintiffs further allege in their complaint that when Mason contacted WCA and "advised them that she could only make periodic payments as she was on Social Security Disability and that [] Smith only worked parttime [sic] and could not make the lump sum payment demanded[,]" WCA told her "that there would be an extra $4,000 for interest and cost [sic] added to the original amount." (Compl., ¶ 23). Mason's requests to WCA for a payment plan were denied, (*id.*, ¶ 24), and WCA advised Smith that he "could not return to school until the total amount was paid, including the additional fees." (*Id.*, ¶ 25). Accordingly, Mason "made the payment to [WCA] for the full amount [] requested . . . , in order that [] Smith could continue his education." (*Id.*, ¶ 26). "Thereafter, [WCA] directed [p]laintiffs to communicate with [the] University regarding [] Smith's readmission[.]" (*Id.*, ¶ 27).

In their affidavits in opposition to the University's motion to dismiss, Smith and Mason assert that because they were assured that Smith would be readmitted, or permitted to resume his studies, once full payment of the outstanding tuition was made, Mason paid the full amount of the outstanding tuition from her social security disability funds, (Smith Aff., ¶ 20; Mason Aff., ¶ 16); and Smith asserts that absent the University's representation that he would be readmitted once full payment of his outstanding tuition was made, he "would have made arrangements to pay it over time rather than putting [his] mother through such a financial burden[,]" (Smith Aff., ¶ 21). Smith makes no reference to WCA, or the additional interest and costs that WCA indicated would accrue under a payment plan, in his affidavit; and Mason's only reference to WCA in her affidavit is that she "paid an initial payment [of the tuition balance due] directly to

[the University] and the balance to [WCA]." (Mason Aff., ¶ 17).

In their complaint, plaintiffs allege that "[a]fter the outstanding tuition payment was made in full, . . . [the] University refused [] Smith's readmission to school[] . . . using another reason for failing to reinstate [] Smith as promised." (Compl., ¶ 28). In their affidavits, Smith and Mason assert that when they contacted the University after Mason paid the outstanding tuition to inquire into Smith's readmission, they were advised "that he would not be permitted to resume [his] studies, with no further explanation." (Smith Aff., ¶ 22; *see also* Mason Aff., ¶ 19).

"To date, [the University] has not allowed [Smith] to resume [his] studies[,]" (Smith Aff., ¶ 23), and if Smith "attends another education institution, he will lose most of his credits already earned and would not be able to complete the program within the required five-year time period." (Compl., ¶ 29).

B. Procedural Background

On October 9, 2015, plaintiffs commenced this action against defendants pursuant to, *inter alia*, Section 1983 and Title VI, alleging violations of their Fourteenth Amendment equal protection rights and discrimination on the basis of race, color, national origin and religion.[3]

[3] Although plaintiffs also refer to Title IV of the Civil Rights Act of 1964, §§ 2000c, *et seq.*, and "Title IX of the Civil Rights Act of 1964" in their complaint, (Compl., ¶¶ 1-2), Title IV "deals comprehensively with school desegregations and authorizes the Attorney General to bring desegregation suits," *Parent Ass'n of Andrew Jackson High Sch. v. Ambach*, 598 F.2d 705, 715-16 (2d Cir. 1979), but only "upon a determination that the state, by law (De jure), has discriminated on the basis of race or color in violation of federal law[,]" *id.* at 712; and there is no statute known as "Title IX of the Civil Rights Act of 1964." "At the federal level, discriminatory harassment in the public schools is governed primarily by two statutes[,]" *Saxe v. State College Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001), *i.e.*, Title VI and Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a). *See Id.* Plaintiffs' complaint does not state a claim for relief under Title IX because plaintiffs do not allege therein that

Plaintiffs also assert state law claims for breach of contract and misrepresentation. Plaintiffs allege that "[v]enue is proper [in this Court] as some of the wrongful acts occurred in Nassau County, New York State, where . . . Mason resides; and where the promises and payments were made and where the breach of contract, by [] defendants . . . occurred from where in full payment of balance due on tuition were transmitted for [] Smith's reinstatement in school." (Compl., ¶ 9).

Plaintiffs now move pursuant to Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction "granting the reinstatement of . . . Smith to [the] University,"[4] and the University moves to dismiss plaintiffs' claims against it in their entirety pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure for lack of personal jurisdiction.

## II. Discussion

### A. Defendants' Motion to Dismiss

#### 1. Standard of Review

"A plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Troma Entm't, Inc. v. Centennial Pictures Inc.*, 729

---

defendants discriminated against Smith on the basis of his gender. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173, 125 S. Ct. 1497, 161 L. Ed. 2d 361 (2005) ("Title IX prohibits sex discrimination by recipients of federal education funding."); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998) ("[Title IX] was modeled after Title VI of the Civil Rights Act of 1964, . . . which is parallel to Title IX except that it prohibits race discrimination, not sex discrimination, and applies in all programs receiving federal funds, not only in education programs.")

[4] Although plaintiffs initially filed their motion for a preliminary injunction *pro se*, on November 30, 2015, the Stewart Law Firm, PLLC, by Marina V. Moreno, Esq., filed a Notice of Appearance on behalf of plaintiffs in this action. Thus, Ms. Moreno filed a reply to defendants' opposition to plaintiffs' motion and an opposition to defendants' motion to dismiss on plaintiffs' behalf.

F.3d 215, 217 (2d Cir. 2013) (quoting *Penguin Grp. (USA) Inc. v. American Buddha*, 609 F.3d 30, 34 (2d Cir. 2010)). "[I]n deciding a pretrial motion to dismiss for lack of personal jurisdiction a district court has considerable procedural leeway. It may determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quotations and citation omitted). "[H]owever, the showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it varies depending on the procedural posture of the litigation." *Id.* (quotations and citation omitted). "Where . . . a district court in adjudicating a motion pursuant to Federal Rule of Civil Procedure 12(b)(2) relies on the pleadings and affidavits, and chooses not to conduct a full-blown evidentiary hearing, plaintiffs need only make a prima facie showing of personal jurisdiction." *Southern New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010); *see also Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 168 (2d Cir. 2015) ("In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists. (quotations and citation omitted)). "This prima facie showing 'must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant.'" *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013), *cert. denied sub nom O'Neill v. Al Rajhi Bank*, 134 S. Ct. 2870, 189 L. Ed. 2d 848 (2014) (quoting *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)); *accord Southern New England Tel.*, 624 F.3d at 138.

"In evaluating whether the requisite showing has been made, [courts] construe the pleadings and any supporting materials in the light most favorable to the plaintiffs." *Licci ex rel.*

*Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013); *see also Chloé*, 616 F.3d at 163. Where, as here, personal jurisdiction is challenged by way of a motion pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, the Court must "assume[] the truth of the plaintiff's factual allegations," *Dorchester*, 722 F.3d at 85 (quotations and citation omitted); *accord Troma*, 729 F.3d at 217, and avoid resolving any "dispute[s] over the authenticity of [the plaintiff's] evidence[.]" *Dorchester*, 722 F.3d at 86. However, courts "will not draw argumentative inferences in the plaintiff's favor . . . , nor . . . accept as true a legal conclusion couched as a factual allegation[.]" *Terrorist Attacks*, 714 F.3d at 673 (quotations and citations omitted).

On a motion to dismiss pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, courts may consider materials outside the pleadings "without converting [the] motion to dismiss for lack of personal jurisdiction into a motion for summary judgment." *Dorchester*, 722 F.3d at 86.

2. Personal Jurisdiction

According to William R. Groves, the vice chancellor, general counsel and secretary of the University, the University (a) is a private non-profit 501(c)(3) institution incorporated in the State of Ohio that operates five (5) campuses located in Los Angeles, California; Santa Barbara, California; Seattle, Washington; Keene, New Hampshire; and Yellow Springs, Ohio, (Declaration of William R. Groves ["Groves Decl."], ¶¶ 3-4); (b) "is not registered to do business in New York, does not conduct business in New York, and does not maintain a New York agent for service of process[,]" (*id.*, ¶ 5); (c) "does not have an office or other place of business in New

York," nor a New York telephone number or mailing address, (*id.*, ¶ 6); (d) "does not have any bank accounts in New York and does not own or lease any real property in New York[,]" (*id.*, ¶ 7); (e) "has an internet presence," but "does not conduct any advertising or marketing activities in New York[,]" (*id.*, ¶ 8); and (f) "does not employ any agents in New York[,]" (*id.*, ¶ 9). Moreover, Groves asserts that the University "is not in any way affiliated with [WCA], which is an independent collection agency hired by [it] and presumably many others[,]" (Groves Decl., ¶ 10); and "does not manage, direct, or control the activities of [WCA][.]" (*Id.*, ¶ 11). In addition, Groves maintains that WCA "does not have the ability to contractually bind or otherwise make decisions on behalf of [the] University." (*Id.*)

a. General Jurisdiction

"General, all-purpose jurisdiction permits a court to hear 'any and all claims' against an entity." *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 134 (2d Cir. 2014) (quoting *Daimler AG v. Bauman*, — U.S. —, 134 S. Ct. 746, 754, 187 L. Ed. 2d 624 (2014)); *see also Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 624 (2d Cir. 2016) ("General jurisdiction . . . permits a court to adjudicate any cause of action against the corporate defendant, wherever arising, and whoever the plaintiff."); *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 225 (2d Cir. 2014), *cert. denied*, 134 S. Ct. 2888, 189 L. Ed. 2d 837 (2014) ("A court with general jurisdiction over a corporation may adjudicate all claims against that corporation– even those entirely unrelated to the defendant's contacts with the state." (emphasis omitted)). "[A] court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render

them essentially at home in the forum State.'" *Daimler*, — U.S. —, 134 S. Ct. at 754 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 131 S. Ct. 2846, 2851, 180 L. Ed. 2d 796 (2011)); *accord Sonera Holding*, 750 F.3d at 225.

"[O]nly a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there." *Daimler*, — U.S. —, 134 S. Ct. at 760; *accord Sonera Holding*, 750 F.3d at 225. "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Daimler*, — U.S. —, 134 S. Ct. at 760 (quoting *Goodyear*, 564 U.S. 915, 131 S. Ct. at 2853-54). "With respect to a corporation, the place of incorporation and principal place of business are paradigm [] bases for general jurisdiction." *Id.* (quotations, alterations and citation omitted); *accord Brown*, 814 F.3d at 627 ("A corporation is 'essentially at home,' . . . where it is incorporated or where it has its principal place of business.")

"Only in the 'exceptional' case will another jurisdiction be entitled to exercise such sweeping powers as the use of its adjudicatory authority to decide matters unrelated to its citizens or to affairs within its borders." *Brown*, 814 F.3d at 627 (quoting *Daimler*, — U.S. —, 134 S. Ct. at 761 n. 19). For purposes of general jurisdiction, "the inquiry . . . is not whether a foreign corporation's in-forum contacts can be said to be in some sense 'continuous and systematic,' it is whether that corporation's 'affiliations with the State are so "continuous and systematic" as to render [it] essentially at home in the forum State.'" *Daimler*, — U.S. —, 134 S. Ct. at 761 (brackets in original) (quoting *Goodyear*, 564 U.S. 915, 131 S. Ct. at 2851); *see also Brown*, 814 F.3d at 629 ("[W]hen a corporation is neither incorporated nor maintains its principal place of business in a state, mere contacts, no matter how 'systematic and continuous,' are extraordinarily

unlikely to add up to an 'exceptional case.'") "[I]n assessing the extent of a corporation's contacts in a state for general jurisdiction purposes, [courts] must assess the company's local activity not in isolation, but in the context of the company's overall activity: the general jurisdiction inquiry 'does not focus solely on the magnitude of the defendant's in-state contacts,' but 'calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide.'" *Brown*, 814 F.3d at 629 (emphasis omitted) (quoting *Daimler*, — U.S. —, 134 S. Ct. at 762 n. 20).

The University is not incorporated, and does not have its principal place of business, in New York. Moreover, this is not "an exceptional case" where the University's alleged contacts with New York "are 'so continuous and systematic as to render it essentially at home in [New York].'" *Gucci*, 768 F.3d at 135 (brackets omitted) (quoting *Daimler*, — U.S. —, 134 S. Ct. at 761 and n. 19); *see also Brown*, 814 .3d at 627 ("[E]xcept in a truly 'exceptional' case, a corporate defendant may be treated as 'essentially at home' only where it is incorporated or maintains its principal place of business– the 'paradigm' cases.") Accordingly, "there is no basis consistent with due process for [this Court] to . . . exercise[] general jurisdiction over the [University]." *Gucci*, 768 F.3d at 135.

b. Specific Jurisdiction

Unlike general jurisdiction, "[s]pecific jurisdiction . . . permits adjudicatory authority only over issues that arise out of or relate to the entity's contacts with the forum." *Gucci*, 768 F.3d at 134 (quotations, brackets and citation omitted); *see also Brown*, 814 F.3d at 624 ("Specific jurisdiction is available when the cause of action sued upon arises out of the

defendant's activities in a state.") "'To determine personal jurisdiction over a non-domiciliary in a case involving a federal question,' [courts] first apply the forum state's long-arm statute.'" *Eades*, 799 F.3d at 168 (quoting *Chloé*, 616 F.3d at 163); *see also Brown.*, 814 F.3d at 624 ("In the absence of a federal statute specifically directing otherwise, and subject to limitations imposed by the United States Constitution, [the Second Circuit] look[s] to the law of the forum state to determine whether a federal district court has personal jurisdiction over a foreign corporation.") "If the long-arm statute permits personal jurisdiction, [the court must] analyze whether personal jurisdiction comports with due process protections established under the Constitution." *Eades*, 799 F.3d at 168; *see also Chloé*, 616 F.3d at 163-64 ("To determine personal jurisdiction over a non-domiciliary [defendant] in a case involving a federal question, the Court must engage in a two-step analysis. . . . First, we apply the forum state's long-arm statute. . . . If the long-arm statute permits personal jurisdiction, the second step is to analyze whether personal jurisdiction comports with the Due Process Clause of the United States Constitution." (citations omitted)).

New York's long-arm statute, N.Y. C.P.L.R. § 302(a), provides, in relevant part, as follows:

> "As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent: 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or 2. commits a tortious act within the state, . . . ; or 3. commits a tortious act without the state causing injury to person or property within the state, . . . , if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or intentional commerce; or 4. owns, uses or possesses any real property situated within the state."

Plaintiffs, by their counsel, allege only that the University transacted business within the State of New York pursuant to Section 302(a)(1).

i. Section 302(a)(1)

"To establish personal jurisdiction under section 302(a)(1), two requirements must be met: (1) [t]he defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity." *Eades*, 799 F.3d at 168 (quoting *Licci*, 732 F.3d at 168)).

"[S]ection 302 is a single act statute and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities [in New York] were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Chloé*, 616 F.3d at 170 (quotations and citation omitted); *accord Eades*, 799 F.3d at 168; *Paterno v. Laser Spine Inst.*, 24 N.Y.3d 370, 376, 998 N.Y.S.2d 720, 23 N.E.23d 988 (N.Y. 2014). "Purposeful activities are those with which a defendant, through volitional acts, avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Eades*, 799 F.3d at 168 (quoting *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380, 849 N.Y.S.2d 501, 880 N.E.2d 22 (N.Y. 2007)); *see also Chloé*, 616 F.3d at 169 ("[A] defendant need not be physically present in New York to transact business there within the meaning of the first clause of section 302(a)(1) . . . as long as he engages in purposeful activities or volitional acts through which he avails himself of the privilege of conducting activities within the State, thus invoking the benefits and protections of its laws . . . ." (quotations, alterations and citations omitted)). "[W]hether a defendant has purposefully availed itself of the New York forum is a fact-intensive inquiry inasmuch as it

requires the trial court, in the first instance, to closely examine the defendant's contacts for their quality." *Licci*, 732 F.3d at 168 (quotations and citation omitted). "More than limited contacts are required for purposeful activities sufficient to establish that the non-domiciliary transacted business in New York." *Paterno*, 24 N.Y.3d at 376, 998 N.Y.S.2d 720. Moreover, "it is not the quantity but the quality of the contacts that matters under [New York's] long-arm jurisdiction analysis." *Id.* at 378, 998 N.Y.S.2d 720; *see also Jonas v. Estate of Leven*, 116 F. Supp. 3d 314, 325 (S.D.N.Y. 2015); *Thorsen v. Sons of Norway*, 996 F. Supp. 2d 143, 155 (E.D.N.Y. 2014).

"The lack of an in-state physical presence is not dispositive of the question whether a non-domiciliary is transacting business in New York." *Paterno*, 24 N.Y.3d at 376, 998 N.Y.S.2d 720. Although "[t]elephone calls and correspondence sent into New York, by a non-domiciliary defendant who is outside New York, generally are insufficient to establish personal jurisdiction[,]" *Int'l Customs Assocs., Inc. v. Ford Motor Co.*, 893 F. Supp. 1251, 1261 (S.D.N.Y. 1995), *aff'd* 201 F. 3d 431 (2d Cir. 1999) (citing cases), the Court of Appeals of the State of New York recognizes personal jurisdiction under Section 302(a)(1) "over commercial actors [] using electronic and telephonic means to project themselves into New York to conduct business transactions[.]" *Paterno*, 24 N.Y.3d at 376, 998 N.Y.S.2d 720 (quotations, alterations and citations omitted); *see also Thorsen*, 996 F. Supp. 2d at 155 ("Contacts by telephone or mail only provide a basis for asserting personal jurisdiction over non-resident defendants where the defendant, through those contacts, projected himself into New York in such a manner that he purposefully availed himself of the privilege of conducting activities in New York and thereby invoked the benefits and protections of its laws." (quotations, brackets and citation omitted)). In *Paterno*, the Court of Appeals of New York held:

> "Regardless of whether by bricks and mortar structures, by conduct of individual actors, or by technological methods that permit business transactions and communications without the physical crossing of borders, a non-domiciliary transacts business when on his or her own initiative [] the non-domiciliary projects himself or herself into this state to engage in a sustained and substantial transaction of business . . . Thus, where the non-domiciliary seeks out and initiates contact with New York, solicits business in New York, and establishes a continuing relationship, a non-domiciliary can be said to transact business within the meaning of CPLR 302(a)(1).

*Id.*, 24 N.Y.3d at 376-77, 998 N.Y.S.2d 720 (quotations, alterations and citations omitted); *see also Mayes v. Leipziger*, 674 F.2d 178, 184-85 (2d Cir. 1982) ("The present case presents none of the characteristics of the kind of purposeful activity in New York that is required by the courts of New York for the invocation of [Section] 302(a)(1). The defendants never entered New York. They did not initiate the contact with the individuals who were in New York; they were 'solicited' by [the plaintiff's] prior California attorney . . . . Defendants were not to perform their services in New York; . . . [and] [t]here was no activity in New York in which defendants sought to participate."); *Fischbarg*, 9 N.Y.3d at 382, 849 N.Y.S.2d 501 ("”[E]ven when physical presence is lacking, jurisdiction may still be proper if the defendant on his or her own initiative [] projects himself or herself into [New York] to engage in a sustained and substantial transaction of business[.]" (quotations, alterations and citation omitted)).

Absent any factual allegations from which it may reasonably be inferred, *inter alia*, that the University sought out and initiated contact with Smith or Mason, or otherwise purposefully availed itself of the New York forum, plaintiffs have not made a prima facie showing that this Court has personal jurisdiction over the University under Section 302(a)(1). The University's communications with plaintiffs regarding the payment of Smith's outstanding tuition, (*see* Compl., ¶¶ 19 and 21), and Smith's application, (Smith Aff., ¶¶ 8-14), "were responsive in

nature, and not the type of interactions that demonstrate the purposeful availment necessary to confer personal jurisdiction over [the University]" under Section 302(a)(1).[5] *Paterno*, at 378, 998 N.Y.S.2d 720. Accordingly, the University's motion to dismiss plaintiffs' claims against it pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure is granted and plaintiffs' claims against the University are dismissed in their entirety for lack of personal jurisdiction.[6]

---

[5] Moreover, there is no articulable nexus between the University's activities in New York and Smith's claims against it. Although "the 'arising from' prong of section 302(a)(1) does not require a causal link between the defendant's New York business activity and a plaintiff's injury[,] . . . it [does] require a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim." *Licci*, 732 F.3d at 168-69 (quotations and citation omitted). "[W]hether a plaintiff's claim arises from a defendant's New York contacts depends upon the nature and elements of the particular causes of action pleaded." *Id.* at 169 (quotations and citation omitted). "[S]ection 302(a)(1) does not require that every element of the cause of action pleaded must be related to the New York contacts; rather, where at least one element arises from the New York contacts, the relationship between the business transaction and the claim asserted supports specific jurisdiction under the statute." *Id.* (quotations and citation omitted).

"Title VI prohibits a recipient of federal funds from discriminating on the basis of race, color, or national origin." *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664 (2d Cir. 2012) (citing 42 U.S.C. § 2000d). "Public educational institutions that receive federal funds are subject to this mandate[,]" *id.*, and may be "liable for intentional discrimination when [they] ha[ve] been 'deliberately indifferent' to teacher or peer harassment of a student." *Id.* at 665. However, the deliberate indifference standard is "narrow" and "[l]iability only arises if a plaintiff establishes: (1) substantial control [over both the harasser and the context in which the known harassment occurs], (2) severe and discriminatory harassment, (3) actual knowledge, and (4) deliberate indifference." *Id.* All of the alleged discriminatory harassment occurred at the University's campus in Seattle, Washington; all of Smith's reports of harassment were made to employees at that campus; and any act, or failure to act, on those reports by the University occurred at that campus. As not even one of the elements of Smith's Title VI claims arises from the University's purported contacts with New York, Smith's claims against the University did not arise from its contacts with New York.

[6] In light of this determination, this Court may not consider plaintiffs' motion for a preliminary injunction against the University pursuant to Rule 65 of the Federal Rules of Civil Procedure. Accordingly, plaintiffs' motion is denied.

III. Conclusion

For the reasons stated herein, the University's motion to dismiss plaintiffs' claims against it pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure is granted; plaintiffs' claims against the University are dismissed in their entirety for lack of personal jurisdiction; and plaintiffs' motion for a preliminary injunction "granting the reinstatement of . . . Smith to [the] University" pursuant to Rule 65 of the Federal Rules of Civil Procedure is denied. An initial conference shall be held before me **on June 21, 2016 at 11:15 a.m.** in Courtroom 1010, at the Central Islip Courthouse, located at 100 Federal Plaza, Central Islip, New York 11722, with respect to plaintiffs' remaining claims against WCA. The remaining parties shall appear with authority, or with individuals with authority, to settle this matter.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of any appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45, 82 S. Ct. 917, 8 L. Ed. 2d 21 (1962).

SO ORDERED.

/s/
SANDRA J. FEUERSTEIN
United States District Judge

Dated: May 5, 2016
Central Islip, N.Y.